2020 IL App (1st) 171780-U

SIXTH DIVISION
Rule 23 filed December 18, 2020
Modified upon denial of rehearing January 22, 2021

No. 1-17-1780

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 09 CR 9023 (02) |
| | ) | |
| KERRY WILLIAMS, | ) | |
| | ) | Honorable Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CONNORS delivered the judgment of the court.
Justices Harris and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Evidence was sufficient to prove defendant's guilt; defense counsel was not ineffective; prosecutor's remark in closing that asserted fact not in evidence was not prejudicial; affirmed.

¶ 2    After a bench trial, defendant, Kerry Williams, was convicted of first-degree murder and aggravated battery with a firearm and sentenced to consecutive prison terms of 40 years for the murder and 6 years for the aggravated battery. On appeal, defendant contends that: 1) the State failed to prove his guilt beyond a reasonable doubt; 2) his counsel was ineffective for failing to

impeach the State's primary witnesses with their inconsistent testimony from his first trial; and 3) the prosecutor committed misconduct by arguing inaccurate facts that were not in evidence. We affirm.

¶ 3    The subject offense occurred on April 20, 2009. Defendant, along with Michael Minnifield and Angelo Straight, was traveling in a vehicle that was used for a drive-by shooting at 6329 South Ellis in Chicago. One victim, Renard Darling, was killed, and another, Theodis Cook-Mims, sustained two gunshot wounds. Defendant, Minnifield, and Straight were arrested for the shooting and each was charged with first-degree murder and aggravated battery with a firearm. Minnifield was tried separately. Ten months after his arrest, Straight went to the police with his attorney and agreed to plead guilty to conspiracy in exchange for testifying that defendant and Minnifield were the shooters. It was undisputed at trial that there were two shooters and that Minnifield was one of them. The question was whether defendant was the second shooter.

¶ 4                      I. BACKGROUND

¶ 5                  A. Defendant's First Trial and Appeal

¶ 6    The instant appeal is from defendant's second trial, which took place on remand from this court. Defendant's first trial, which was before a jury, was summarized in *People v. Williams*, 2015 IL App (1st) 122745 (*Williams I*). There, Cook-Mims and Straight testified for the State. Cook-Mims, the surviving victim, identified defendant as one of the shooters at trial, but had not done so in previous statements. Straight testified that he was the driver during the incident, defendant was in the front passenger seat, and Minnifield was in the back seat. He stated that the three men drove to rival gang territory, where defendant and Minnifield opened fire when they saw what appeared to be rival gang members. Straight admitted that he told police various versions of the incident. He also acknowledged that he faced a 90-year sentence, but would only serve 7½ years

in exchange for his testimony. Defendant testified in his defense that he was not one of the shooters and that Straight was the second shooter. Defendant stated that he had been drinking and smoking marijuana and was sleeping or passed out in the passenger seat until just before the shooting occurred. According to defendant, Straight reached across him from the driver's seat to fire shots while Minnifield fired from the back seat. The physical evidence showed that defendant, Minnifield, and Straight all had gunshot residue on their hands. Shell casings were found both inside and outside the car that was involved and all of the recovered shell casings matched two guns that were eventually recovered.

¶ 7    The jury convicted defendant of first-degree murder and aggravated battery with a firearm. The jury also found that defendant personally discharged a weapon in commission of the offense. Defendant was sentenced to 48 years in prison.

¶ 8    On appeal from the first trial, defendant successfully argued that the prosecutor improperly vouched for Straight's credibility during closing argument. *Williams I*, 2015 IL App (1st) 122745. This court stated that because "the physical evidence *** was insufficient to prove the identity of the second shooter[,] *** it would be problematic if the Government 'vouched' for Straight by putting the State's stamp of approval on his testimony." *Id*. ¶ 13. We found that the evidence of whether defendant or Straight was the second shooter was closely balanced, and so the probability that the conviction was caused by even a minor trial error was greatly enhanced. *Id*. ¶¶ 24, 26. We reversed the judgment and remanded the cause for a new trial. *Id*. ¶ 27.

¶ 9                            B. Defendant's Second Trial

¶ 10    At defendant's second trial, which was a bench trial that is the subject of this appeal, Cook-Mims and Straight again testified for the State. Cook-Mims testified that he had been a member of the Gangster Disciples and acknowledged his previous criminal convictions, which included an

out-of-state conviction for criminal possession of a forged instrument. He further stated as follows. In the evening hours of April 20, 2009, Cook-Mims visited Darling, the decedent, at 6329 South Ellis before Cook-Mims and some friends left Darling's house to get some marijuana. Cook-Mims smoked the marijuana and the group went back to Darling's house, where Cook-Mims noticed a car coming. He heard an engine rev and turned around to see a blue Charger that had a red laser beam coming out of the back window. Hearing shots from the Charger, Cook-Mims searched for cover and eventually crawled under Darling's porch as Cook-Mims was getting shot. Cook-Mims's body was in an L-shape, with his head pointed toward 63rd Street and his feet "out and still on the Ellis part." The porch stairs were very steep and from his position, he "could see everything that's basically happening," including that there were three people in the Charger and defendant was shooting from the front passenger seat. Cook-Mims knew defendant's face and had seen him before. Cook-Mims first stated that he saw defendant shooting before he was under the porch, but then stated that only when he was under the porch could he see who was shooting. Cook-Mims could not see the shooter's gun, but he could see fire coming out of it, so he knew "he's shooting a gun." The shooting briefly paused and Cook-Mims heard someone say "wait" several times, whereupon the Charger stopped before the shooting resumed for 10 or 15 more shots. The car drove off and Cook-Mims went into the house, where Darling was bleeding from his neck.

¶ 11    Cook-Mims further testified that one of his friends drove him to the hospital, though he also stated that he drove the car into the doors of the emergency room. He spoke with police officers at the hospital, but did not give the officers the names of the shooters because he wanted to leave town, did not think that Darling had died, and thought that "the streets were going to handle it themselves."

¶ 12    The next day, Cook-Mims went to the police station and viewed a lineup, in which he recognized defendant, Minnifield, and Straight. He testified that "like I said before, when you look at those two dudes, they look like they could be brothers." Cook-Mims made an in-court identification of defendant as one the people who was in the Charger.

¶ 13    On cross-examination, Cook-Mims initially stated that he was "getting high" when he returned to Darling's house. Cook-Mims and defense counsel then had the following exchange:

"Q. And during [Minnifield's] trial, you were asked the question, you were high before the shooting, and you responded yes. Is that correct?

A.  Maybe. I was getting high, like I said.

Q. So as you sit here today, were you high at the time—you were high at the time of the shooting, right?

A. I would say."

¶ 14    Defense counsel and Cook-Mims also had the following exchange about his testimony that defendant was one of the shooters:

"Q. Sir, do you recall being asked at your first trial—well, do you remember saying and not correcting the statement of yours; Theodis wasn't really paying attention to Kerry and didn't see if Kerry had a gun or not.

And the answer you gave; when I was sitting there then, I wasn't looking at him in the front seat. When I seen that beam coming from the backseat, that's what I'm paying attention to, so I had seen that beam, I heard them shots, and I went down.

A. That's what I just told you again, it's just worded different, but that's exactly what I said."

Cook-Mims affirmed that the only time he saw defendant shoot a gun was while Cook-Mims was under the porch.

¶ 15    Defense counsel also asked Cook-Mims about a statement he made two days after the shooting to an assistant State's Attorney. When shown the statement that was typed up by the assistant State's Attorney, Cook-Mins noted that he signed every page, but probably did not read every page thoroughly. The statement included the passage, " 'Theodis also saw Kerry in the front passenger seat of the car. Theodis wasn't really paying attention to Kerry and did not see if Kerry had a gun or not.' " The statement also read in part, " 'Theodis states he does not know if it was one gun or two being fired.' " Cook-Mims explained that this portion of the statement referred to when the first shots first rang out. Defense counsel asked, "And this doesn't say that you ever saw Kerry Williams with a gun, right?" Cook-Mims replied, "I don't know where it says it in that statement anywhere," but again maintained that he could see who was shooting when he was under the porch.

¶ 16    Straight, the driver of the Charger, testified that he was initially charged in this case, but later entered into a plea agreement. Straight pled guilty to a single count of conspiracy to commit murder and received a sentence of 15 years in prison, to be served at 50 percent. At the time of his testimony, Straight was on parole. Straight acknowledged prior convictions for unlawful use of a weapon and for selling marijuana. He further testified as follows. Straight joined the Black Stones when he was 17 years old. In July 2007, Straight was shot while he was shooting dice with Minnifield and some other people. In December 2008, another member of the Black Stones, Sergio Dukes, was killed. Minnifield was with Dukes at the time. Before the shooting at issue, a Black Stone named Tommy Williams was killed.

¶ 17    On April 20, 2009, Straight drove his Charger to defendant's house at 79th and Kimbark. Defendant had a .40-caliber handgun that he put in a stash spot in the back of the car and they picked up Minnifield. The three men went to a liquor store and tried to go to a music studio. When they could not enter the studio, the men went to the home of someone named Deuce, where they drank and played cards with other members of the Black Stones. At one point, the men went to a liquor store and then drove to Gangster Disciple territory. Minnifield retrieved the .40-caliber gun from the stash box and suggested they go to the home of the person who killed Dukes. First, however, the men went to see a person named Jonathan Fuller, who gave them a .45-caliber gun that defendant took. After driving around looking for the person who killed Dukes, the men eventually came to 64th and Ellis, where Straight observed a group of people standing on the street. At the time, Straight was driving, defendant was in the front passenger seat, and Minnifield was in the back passenger seat. Straight pulled up to the group of people and defendant and Minnifield fired about 17 shots at them. When the gunfire stopped, Straight sped off until Minnifield told him to stop, at which time defendant and Minnifield fired about 10 more shots. Defendant hung out of the car during the second wave of shots. Straight acknowledged that during Minnifield's trial, Straight testified that Minnifield also hung out of the car during the second wave of shots. The three men returned to Deuce's house, where defendant gave both guns to someone named Fuzzy. Later, on the way to the home of Minnifield's girlfriend, Straight, defendant, and Minnifield were pulled over by the police and arrested.

¶ 18    Straight acknowledged that the guns used during the offense were actually bought for Straight in Iowa by his mother. When Straight first entered into his plea agreement, he had not revealed the guns' true origin, but he later admitted it after an assistant State's Attorney brought it up.

¶ 19    On cross-examination, Straight admitted telling the following lies to the police: 1) he, defendant, and Minnifield had been playing cards all day; 2) he loaned his car to defendant and Minnifield and Straight did not know where they went; 3) he test fired one of the guns on the day of the incident at the request of either defendant or Minnifield; and 4) Straight had test fired a gun that a man tried to sell him. Straight recalled that during the two or three days he was interrogated by the police, he never said that defendant was the shooter. Defense counsel and Straight also had the following exchange:

"Q. [I]s it fair to say that you are a person who will lie when it suits your purpose?

A.  In those situations, yes, that was the case.

Q. Are you agreeing with me that when it suits your purpose, you will lie?

A. In those situations, I would say yes.

Q. And the deal that you got from the State's Attorney's Office served your purpose, didn't it?

A. Yes.

Q. It was the deal of a lifetime, wasn't it?

A. Yes."

Straight did not agree with defense counsel's suggestion that he "would have said anything to get that deal."

¶ 20    Straight acknowledged that defendant was drinking heavily on the date of the incident and that the group had made repeated trips to the liquor store. Straight recalled that defendant was from a different gang faction than him and admitted that Straight and Minnifield sought revenge for

Dukes's death. Defendant was not present when Dukes was killed. Straight also noted that Gangster Disciples had tried to kill him a few times, including an incident—where Minnifield was present—where Straight was shot close to his spinal cord and spent three weeks in the hospital. Straight admitted that although he testified on direct that defendant had a gun and another gun was obtained from Fuller, both guns were actually Straight's and they were purchased to get revenge on the Gangster Disciples.

¶ 21    The parties entered stipulations about physical evidence, which we summarize in part below. Pursuant to a search of the car after it was pulled over, a police officer recovered one .45-caliber fired shell casing on the floor behind the driver's seat, two .40-caliber fired shell casings outside the car between the hood and front windshield, and two .45-caliber fired shell casings outside the car between the trunk and rear window. Due to a storm with hail, icy rain, and heavy winds that blew sideways, the officer immediately collected the casings and inventoried them. An evidence technician recovered five .45-caliber shell casings and five .40-caliber shell casings from the street at 6329 South Ellis. Also, five .45-caliber and four .40-caliber shell casings were recovered from the street from 6322 South Ellis. A fired bullet was recovered from underneath the porch at 6329 South Ellis. Other fired bullets and metal fragments were also recovered from the scene.

¶ 22    In August 2009 and March 2010, officers recovered a Glock .40-caliber semiautomatic handgun and a Springfield .45-caliber semiautomatic handgun. A forensic scientist with the Illinois State Police would testify that all of the recovered .40-caliber fired cartridge cases were fired from the recovered .40-caliber gun and all of the recovered .45-caliber fired cartridge cases were fired from the recovered .45-caliber gun.

¶ 23    Gunshot residue tests were administered to Straight, defendant, and Minnifield in the early morning hours of April 21, 2009. A forensic scientist with the Illinois State Police would testify that the gunshot residue kits indicated that Straight had five unique gunshot residue particles on his right hand and two unique gunshot residue particles on his left hand. Defendant had eight unique gunshot residue particles on his right hand and eight unique gunshot residue particles on his left hand. Minnifield had one unique gunshot residue particle on his right hand and three unique gunshot residue particles on his left hand. Each of the three men discharged a firearm, contacted a primer gunshot residue related item, or had both hands in the environment of a discharged firearm.

¶ 24    In his defense, defendant testified in part as follows. At the time of the incident, defendant was a member of the Black Stones. In the afternoon on April 20, Straight picked up defendant in a Charger and together they picked up Minnifield. Straight and Minnifield were from a different section of the Black Stones than defendant and were closer friends with each other than they were with defendant. The three men went to a liquor store and bought a couple fifths of alcohol. At the time, defendant was an alcoholic. Defendant had not eaten that day and started drinking in the car. The men tried to go to a studio but ended up at Deuce's house, where defendant drank, played cards, and smoked marijuana. He finished two bottles of gin and went to the liquor store two or three more times.

¶ 25    Around 10 p.m., defendant left with Straight and Minnifield, thinking they were going back to the liquor store. Defendant was drunk and "wasted." Straight drove and Minnifield sat in the back passenger seat. Defendant reclined the front passenger seat to rest his head because he was dizzy. Defendant's eyes were closed and he did not know there were guns in the car. At one point, Straight tapped defendant and said, "[L]ook at them snoozing, they snoozing," which meant some people had been caught not paying attention. Straight pushed defendant back, reached over, and

started shooting. Straight's gun was loud and in defendant's face area. Defendant's ears were ringing and he saw a spark and covered his eyes, which were burning a little bit. Defendant heard Minnifield shooting as well. After about a minute of shooting, Straight drove back to Deuce's house, where Straight gave the guns to Fuzzy. While picking up food later, defendant, Straight, and Minnifield were pulled over by the police and arrested. Defendant did not tell the police that Straight and Minnifield were the shooters because the police "said whatever I said I was [going to] be charged anyway." Defendant acknowledged his prior convictions for possession of a controlled substance and aggravated unlawful use of a weapon.

¶ 26    In its closing, the State asserted that Cook-Mims testified credibly and Straight's testimony corroborated Cook-Mims's testimony. The prosecutor reserved its remaining comments for rebuttal.

¶ 27    In his closing, defense counsel disputed that Cook-Mims saw defendant shooting, noting that a photograph in evidence showed that the porch was solid. Cook-Mims could not have seen what was happening in the driver's seat from his position. Defense counsel noted that Cook-Mims gave a statement to an assistant State's Attorney in which he said he was not really paying attention to defendant and did not see if defendant had a gun or not. Further, Cook-Mims would have told the assistant State's Attorney if he had indeed seen defendant shooting from the front seat. Defense counsel contended that Straight was the second shooter, asserting that Straight had a much greater motive to shoot. Defense counsel posited that the car stopped during the shooting because Straight, who was driving, had to stop to shoot. Further, Straight had a similar pattern of gunshot residue particles as Minnifield, who was a shooter. Meanwhile, defendant's hands were "in a cloud of gun powder residue" because his hands were in front of his face while a gun was fired in front of his face.

¶ 28    Defense counsel also discussed the recovered shell casings. Many shell casings were found outside the car, but it was extremely windy that night. Due to the weather conditions, "where the shell casings lie doesn't tell us anything because they are blowing all over the place." Defense counsel also noted that defendant's testimony was consistent with Straight's testimony about drinking heavily that day.

¶ 29    In rebuttal, the prosecutor stated that defendant "hid behind I don't know, I don't remember," while Straight answered questions. The prosecutor also asserted that the distribution of shell casings "is so important because of what Mr. Williams wants you to believe," which is that he was laying down in the front seat and Straight fired in front of his face. The prosecutor continued:

> "MR. REEDY [(ASSISTANT STATE'S ATTORNEY)]: What happens when an automatic gun when it is fired? What happens to the casings? Plop, plop, plop.
>
> MR. LASSAR [(DEFENSE COUNSEL)]: There is no evidence about where shell casings land from an automatic gun.
>
> THE COURT: As I tell the jury, anything that the lawyers say in closing arguments is not to be considered as evidence. Go ahead.
>
> MR. REEDY: Judge, the guns are in evidence. They are semiautomatic weapons. Judge, just like every other semiautomatic weapon, when the shell casing comes out, it plops down *** to the right, and what happens at that time, it should be landing right on top of him. Right on top of the defendant.

He told you *** time and time again the shots were being fired right there. Not only that, but there should be sparks all over his face. There were no marks all over his face from that.

How did they get on the street? *** They get on the street because the person that was firing the gun had the gun outside most of the time when it was being fired. *** [T]here was one casing in the car. *** The others were found on top of the car and all over the street."

The prosecutor also characterized defendant's testimony as preposterous. The prosecutor asserted that it was not believable that defendant slept while his two friends "[drove] him into a war zone." Noting that there were three men and two guns, the prosecutor stated that it made "perfect common sense" that the two men who were not driving would have the guns. The prosecutor further stated that Straight could not have pushed down defendant and reached over to shoot "because of all the casings there. So he is firing the gun in the car as he is sitting there." For defendant's version of the incident to be true, Straight would have had to reach over "and hold the gun almost at an angle like this where he is turning his wrist," which was "ridiculous." The prosecutor concluded by acknowledging that Straight had an agreement to testify, but had never been charged as the shooter or as a person who personally discharged a firearm.

¶ 30    In its ruling, the court noted that most of the shell casings were outside the vehicle. If Straight had been the shooter from the driver's seat, "as Mr. Williams said, the weapon was by his face, maybe about two feet from it, meaning distance from his nose to the weapon, that would be impossible for that many shell casings to be outside the vehicle." Further, there was no complaint that defendant was deafened by the weapon going off in front of his face, which made his testimony less believable. The court found Straight credible, but acknowledged that he had lied to the State

about where the weapons came from. The court stated there were some inconsistencies with Cook-

Mims's testimony, but noted that it resolved them. Ultimately, the court found defendant guilty of

first-degree murder and that defendant had personally discharged a firearm during the commission

of the offense. Defendant was also found guilty of aggravated battery with a firearm.

¶ 31     Defendant filed a motion for a new trial, asserting in part that the State made improper

comments in closing based on facts not in evidence when the prosecutor argued that "when

semiautomatic weapons are fired, the shell casings eject over the right side of the shooter." The

State continued the improper argument after the court overruled an objection, stating that when a

shell casing comes out, "it plops down *** to the right." Defendant contended that the error was

prejudicial because the court partly based its guilty verdict on this evidence, having found that it

"would be impossible for that many shell casings to be outside the vehicle" if Straight had been

shooting.

¶ 32     In its response, the State asserted that the weapons were introduced into evidence and the

court could take judicial notice of the workings of a semiautomatic handgun.

¶ 33     On June 29, 2017, the court denied the motion for a new trial. After a sentencing hearing,

defendant was sentenced to 40 years in prison for first-degree murder and 6 years in prison for

aggravated battery with a firearm, to be served consecutively. Defendant subsequently appealed.

¶ 34                                II. ANALYSIS

¶ 35                        A. Sufficiency of the Evidence

¶ 36     On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that

he was the second shooter. Defendant argues that Cook-Mims was a rival gang member whose

testimony was impeached by his prior statement that he was not paying attention to defendant and

did not see if he had a gun. Defendant also asserts that Straight was an accomplice and admitted liar who received an extremely lenient sentence in exchange for his testimony.

¶ 37    When presented with a challenge to the sufficiency of the evidence, a reviewing court must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)). The question is not whether the reviewing court believes the evidence at trial established guilt beyond a reasonable doubt. *People v. Young*, 128 Ill. 2d 1, 49 (1989) (quoting *Jackson*, 443 U.S. at 318-19). Instead, the question "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* The reviewing court does not retry the defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). The trier of fact is responsible for fairly resolving conflicts in the evidence, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). While the trial court's decision to accept testimony is not conclusive (*Cunningham*, 212 Ill. 2d at 280), a conviction will not be reversed "simply because the evidence is contradictory [citation] or because the defendant claims that a witness was not credible" (*Siguenza-Brito*, 235 Ill. 2d at 228). A reviewing court will not reverse a conviction unless the evidence is unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *Jackson*, 232 Ill. 2d at 281.

¶ 38    Because it is a matter disputed by the parties, we clarify that there was no finding in *Williams I*, 2015 IL App (1st) 122745, that the evidence was sufficient to find defendant guilty beyond a reasonable doubt. In the context of deciding whether the prosecutor's closing argument substantially prejudiced defendant, we stated that the evidence at trial was closely balanced (*id.* ¶¶

23-24), which is "a separate question from whether the evidence is sufficient to sustain a conviction" (*People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007)). Evidence can be both closely balanced and sufficient to find a defendant guilty beyond a reasonable doubt. See *id.* at 567-68. And that is the situation here.

¶ 39    We review the key pieces of evidence. Cook-Mims, a surviving victim, testified that after he heard shots, he crawled under Darling's porch, where he could "see everything," including that defendant was shooting from the front passenger seat of the car. Cook-Mims had seen defendant before. As an aside, the trial transcript does not definitively establish who Cook-Mims was describing when he testified, "those two dudes, they look like they could be brothers." Cook-Mims admitted he was high at the time of the shooting. His testimony was inconsistent on certain points, such as when precisely he saw defendant shooting. Cook-Mims was also confronted with his prior statement in which he stated he was not paying attention to defendant and did not know if one or two guns were being fired, which he explained referred to when the first shots first rang out.

¶ 40    We acknowledge that Cook-Mims's testimony had flaws. There is a clear motive to lie when the witness identifying a defendant is a member of  rival gang. *People v. Johnson*, 208 Ill. 2d 53, 103 (2003). Still, "even contradictory testimony does not necessarily destroy the credibility of a witness." *People v. Gray*, 2017 IL 120958, ¶ 47. That Cook-Mims was high during the shooting goes to the weight of his testimony (*People v. McGuire*, 18 Ill. 2d 257, 259 (1960)), and we may not overturn the trier of fact on questions involving the weight or credibility of testimony unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt (*People v. Zapata*, 347 Ill. App. 3d 956, 962 (2004)). The fact finder was responsible for deciding how flaws in part of the testimony affected the credibility of the whole. *Gray*, 2017 IL 120958, ¶ 47. The flaws in Cook-Mims's testimony were

all presented to the trial court and did not make the testimony impossible for the fact finder to accept. See *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011) (reviewing court may find that flaws in testimony make it impossible for fact finder to reasonably accept any part of the testimony). We have reviewed the photo of the porch from where Cook-Mims saw defendant. Keeping in mind that we must view the evidence in the light most favorable to the State (*Cunningham*, 212 Ill. 2d at 278), Cook-Mims's testimony could reasonably be accepted as true beyond a reasonable doubt.

¶ 41    Turning to Straight's testimony, he stated that defendant fired shots from the front passenger seat of the car that Straight was driving. The testimony of an accomplice witness "has inherent weaknesses, being testimony of a confessed criminal and fraught with dangers of motives such as malice toward the accused, fear, threats, promises or hopes of leniency, or benefits from the prosecution." (Internal quotation marks omitted.) *People v. Williams*, 147 Ill. 2d 173, 232 (1991). Yet, whether corroborated or uncorroborated, accomplice testimony is sufficient to sustain a criminal conviction if it convinces the fact finder of the defendant's guilt beyond a reasonable doubt. *People v. McLaurin*, 184 Ill. 2d 58, 79 (1998).

¶ 42    As defendant points out, Straight's testimony had weaknesses. His testimony was inconsistent at times, including about how the gun was obtained, and he previously lied to law enforcement before receiving an extremely favorable plea deal. However, the weaknesses of an accomplice's testimony "affect only the weight of the evidence and credibility to be attributed to the witness's testimony," and so "are matters within the province of the trier of fact." *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 43. The trial court was presented with the weaknesses in Straight's testimony that defendant raises on appeal. In spite of those weaknesses, the trial court found Straight credible. A key portion of Straight's testimony—that defendant fired shots from the

front passenger seat—was corroborated by Cook-Mims's testimony. Testimony may be found insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. That is not the case here.

¶ 43    We also find that the flaws in Straight's testimony were not as extreme as those of the witnesses in two cases relied on by defendant: *People v. Schott*, 145 Ill. 2d 188 (1991), and *People v. Casciaro*, 2015 IL App (2d) 131291. In *Schott*, 145 Ill. 2d at 206-07, the State's key witness admitted she was a person who lied a lot, she was impeached numerous times on a variety of topics, and her testimony was fraught with inconsistencies and contradictions. In *Casciaro*, 2015 IL App (2d) 131291, ¶¶ 109-112, a witness was "willing to tailor his testimony for favors received," admitted he lied whenever it suited him, and changed and embellished his story over time. The testimony of the State's other witnesses in *Casciaro* was also incredible. *Id*. ¶¶ 113-14. As discussed above, Straight's testimony that defendant was the shooter was corroborated. Straight's testimony itself was not impossible to accept. We will not disturb the trial court's finding that Straight was credible, where all of the weaknesses that defendant raises were presented and considered below.

¶ 44    The parties also dispute the significance of defendant's testimony. The State characterizes defendant's testimony as self-serving and nonsensical and states that when a defendant chooses to testify, he must tell a reasonable story or be judged by its improbabilities, citing *People v. Morehead*, 45 Ill. 2d 326, 330 (1970). Defendant responds that a conviction must rest on the strength of the State's case and not on the weakness of the defendant's, citing *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 34. For clarity's sake, we note that the burden of proving a defendant's guilt beyond a reasonable doubt always rests on the prosecution, and a defendant need not offer

any proof of innocence. *People v. Abadia*, 328 Ill. App. 3d 669, 679 (2001). When a defendant chooses to testify and gives an implausible explanation for this behavior, a trier of fact may draw negative inferences. *People v. Scott*, 2018 IL App (2d) 151056, ¶ 31. However, that the trial court did not believe a defendant's testimony does not mean that the State proved guilt beyond a reasonable doubt. *Sanchez*, 2013 IL App (2d) 120445, ¶ 34.

¶ 45    Defendant testified that Straight was the second shooter. An assertion that another person committed the offense does not necessarily raise a reasonable doubt as to a defendant's guilt. *People v. Tenney*, 205 Ill. 2d 411, 429 (2002). Also, the trial court found defendant's testimony less credible than that of Cook-Mims and Straight, and we may not substitute our judgment for that of the trial court on questions involving the credibility of the witnesses. *Jackson*, 232 Ill. 2d at 280-81.

¶ 46    Lastly, we address the physical evidence, which included shell casings, fired bullets, the recovered guns, and gunshot residue tests. The State and defendant each posit that the distribution of gunshot residue particles supports their version of the incident, but we cannot draw either party's desired conclusion based on the record. Defendant also notes that in *Williams I*, this court determined that the physical evidence was insufficient to prove the identity of the second shooter. *Williams I*, 2015 IL App (1st) 122745, ¶ 13. Defendant asserts that this determination is the law of the case, which is a doctrine that bars relitigation of an issue already decided in the same case. *People v. Tenner*, 206 Ill. 2d 381, 395 (2002).

¶ 47    Law of the case or not, the physical evidence at defendant's second trial was indeed insufficient to prove the identity of the second shooter. But combined with the testimony that the trial court found credible—a determination we cannot disturb (*Jackson*, 232 Ill. 2d at 280-81)—the evidence was sufficient to prove defendant's guilt. Two witnesses, one of whom was in the car

with defendant, identified defendant as the second shooter. See *Rouse*, 2014 IL App (1st) 121462, ¶ 58 (lack of physical evidence does not raise a reasonable doubt where an eyewitness has positively identified defendant as the perpetrator of the crime). Cook-Mims's and Straight's testimonies were not so improbable as to find a reasonable doubt of defendant's guilt. Further, the weaknesses that defendant raises were all presented to, and rejected by, the trial court. Viewing all of the evidence in the light most favorable to the State, a rational trier of fact could find that defendant was the second shooter.

¶ 48                     B. Ineffective Assistance of Counsel

¶ 49     Next, defendant contends that his counsel was ineffective for failing to impeach the State's primary witnesses with their inconsistent testimony from defendant's first trial. Defendant notes the following instances where Cook-Mims's testimony differed between the first and second trials: 1) whether the car started moving forward after the first wave of shots; 2) his actions immediately before the shooting; and 3) whether he read his statement to law enforcement before signing it. Defendant also notes the following instances where Straight's testimony differed between the first and second trials: 1) whether the group called Jonathan Fuller before obtaining the gun; 2) how long he was at Deuce's house after the shooting; 3) the location of Deuce's house; 4) where he picked up defendant before the shooting; 5) whether Minnifield used defendant's phone in the car; and 5) the events and details surrounding Sergio Dukes's murder. Defendant asserts that the defense strategy was to attack Straight and Cook-Mims's credibility. Thus, further impeachment was consistent with the trial strategy and there was no sound strategic reason for failing to impeach the State's main witnesses with their prior inconsistent statements.

¶ 50     To establish ineffective assistance of counsel, a defendant must show that: 1) his counsel's performance was deficient, and 2) the deficient performance prejudiced the defense. *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984). Failure to fulfill either the deficiency or prejudice prong defeats the claim. *People v. Palmer*, 162 Ill. 2d 465, 475 (1994). Effective assistance of counsel means competent, not perfect, representation. *Id*. at 476. Courts indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *People v. Pecoraro*, 175 Ill. 2d 294, 319 (1997). Judicial scrutiny of counsel's performance is highly deferential and a defendant "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Id*. at 319-20. A court will deem counsel's assistance ineffective "[o]nly if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case." *People v. Perry*, 224 Ill. 2d 312, 355-56 (2007).

¶ 51    The way an attorney cross-examines a witness "involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court." *Pecoraro*, 175 Ill. 2d at 326-27. To succeed on an ineffective assistance claim, a defendant must show that counsel's approach to cross-examination was objectively unreasonable. *Id*. at 327.

¶ 52    Defense counsel's performance here was far from deficient. Counsel focused on undermining key aspects of Cook-Mims's and Straight's testimonies that related to the shooting itself. During cross-examination, Cook-Mims admitted that he was high—not just "getting high"—at the time of the shooting. Counsel also presented Cook-Mims's prior statements that he was not really paying attention to defendant, did not see if defendant had a gun or not, and did not know if one or two guns were fired. During his cross-examination, Straight admitted that he told the police multiple untrue versions of the incident and that when he was initially interrogated, he never said that defendant was the shooter. Straight also admitted that he received "the deal of a lifetime" and agreed with counsel that he lies to suit his purpose "in those situations." Counsel

exposed the inconsistency in Straight's testimony about how the guns were acquired and Straight acknowledged that the guns were bought for revenge. Counsel elicited testimony to support the theory that Straight and Minnifield—and not defendant—had a motive to seek revenge from Gangster Disciples.

¶ 53    It was not unreasonable for counsel to focus on certain areas of the witnesses' testimony, rather than inquire about every inconsistency regardless of its relevance to the actual shooting. Some of the inconsistencies that defendant raises could have been due to the approximately eight years that had passed since the offense. See *People v. Flores*, 231 Ill. App. 3d 813, 826 (1992) (presenting certain conflicting testimony could have led the jury to conclude that the witness made an honest mistake based on trying to remember an event that took place more than a year before the trial). More generally, counsel conducted meaningful adversarial testing of the State's case, including in a vigorous closing argument that tied together the physical evidence and the witnesses' testimonies.

¶ 54    The purpose of impeachment is to destroy credibility. *People v. Mason*, 324 Ill. App. 3d 762, 766 (2001). That counsel's strategy was unsuccessful, or that counsel might have chosen a different strategy in hindsight, does not make a strategy constitutionally ineffective. *People v. Massey*, 2019 IL App (1st) 162407, ¶ 31. The trial court found the State's witnesses credible, but that does not mean that counsel was ineffective. We cannot say that counsel's strategy was objectively unreasonable. Defendant has failed to show that his counsel was ineffective.

¶ 55                                C. Closing Argument

¶ 56    Lastly, defendant contends that the prosecutor committed misconduct in closing argument when the prosecutor argued in rebuttal that semiautomatic weapons eject shell casings down and to the right. Defendant asserts that this argument was not based on the evidence and is factually

incorrect. According to defendant, the State tried to bolster the strength of the physical evidence by arguing that the location of the ejected casings proved that defendant, and not Straight, was the second shooter. Defendant contends that he was prejudiced by the misconduct because the trial court relied on the improper argument in finding defendant guilty.

¶ 57   As a preliminary matter, the State asserts that defendant forfeited this issue. The State contends that defendant only objected to the comment that shell casings go "plop, plop, plop," and not to the comment that shell casings go "to the right." The State also asserts that defendant did not raise the issue in his posttrial motion.

¶ 58   Generally, to preserve an issue for appellate review, a party must raise the issue before the trial court and in a posttrial motion. *People v. Colyar*, 2013 IL 111835, ¶ 27. Defendant did both. At trial, after the prosecutor stated, "What happens to the casings? Plop, plop, plop," defense counsel objected, asserting that "[t]here is no evidence about where shell casings land from an automatic gun." The trial judge overruled the objection, and the prosecutor continued, stating in part that "just like every other semiautomatic weapon, when the shell casing comes out, it plops down *** to the right, and what happens at that time, it should be landing right on top of him." In his posttrial motion, defendant contended that the State made improper comments in its closing argument based on facts not in evidence. Defendant also recalled in the motion that the prosecutor argued that "when semiautomatic weapons are fired, the shell casings eject over the right side of the shooter." Defendant raised at trial and in a posttrial motion that the prosecutor improperly commented on where shell casings land. The issue is not forfeited.

¶ 59   Turning to the merits, "[a] closing argument must be viewed in its entirety, and the challenged remarks must be viewed in their context." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). A prosecutor has wide latitude in making a closing argument and may comment on the

evidence and any fair and reasonable inferences it yields. *Id.* A prosecutor may respond to comments made by defense counsel that invite a response. *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 47. Also, a prosecutor may remark on "matters of common knowledge and experience," but may not misstate the facts or argue facts not in evidence. *People v. Cruz*, 2019 IL App (1st) 170886, ¶ 41.

¶ 60    Misconduct in closing argument is substantial and warrants reversal and a new trial if the improper remarks constituted a material factor in the defendant's conviction. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). The issue is whether the trier of fact could have reached a contrary verdict if the improper remarks had not been made. *People v. Linscott*, 142 Ill. 2d 22, 28 (1991). "If a reviewing court cannot say that the prosecutor's improper comments did not contribute to the defendant's conviction, the court should order a new trial." (Internal quotation marks omitted.) *Id.*

¶ 61    The parties disagree about the applicable standard of review. The State asserts that we review a prosecutor's remarks for an abuse of discretion, while defendant contends that whether prosecutorial misconduct denied a fair trial is reviewed *de novo*. This court has stated that while there appears to be a conflict about which standard of review applies, "a careful review of supreme court precedent establishes that no such conflict exists." *People v. Cook*, 2018 IL App (1st) 142134, ¶ 63 (collecting and discussing cases). Each standard applies to a different part of the analysis. A reviewing court applies an abuse of discretion standard to determinations about the propriety of a prosecutor's remarks during argument, and reviews *de novo* the legal issue of whether improper remarks were so egregious that they warrant a new trial. *Id.* ¶ 64. See also *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 35.

¶ 62    With those principles in mind, we find that the prosecutor's remark that a shell casing "plops down *** to the right" was improper. There was no evidence at trial about the trajectory of

ejected shell casings. The State asserts that the guns were entered into evidence and the trial judge could view the eject ports and see they were located on the right side of the guns. But whether a shell casing ejects to the right or to the left is not self-evident from a gun itself. Even if the prosecutor was responding to defense counsel's statement that the placement of the shell casings did not "tell us anything because they are blowing all over the place," the prosecutor crossed the line by adding a new fact that was not presented at trial. A prosecutor does not have *carte blanche* to make up evidence when responding to defense counsel's closing argument (see *Sykes*, 2012 IL App (4th) 111110, ¶ 47), though we take no position on whether the prosecutor's assertion was correct. The trajectory of a shell casing was not a fact in evidence and the prosecutor's remark was improper.

¶ 63    The next question is the impact of the remark. "The weight of the evidence in a case is a relevant consideration in determining whether the remarks prejudiced the defendant." *Linscott*, 142 Ill. 2d at 40. See also *People v. Jones*, 2016 IL App (1st) 141008, ¶ 26 (relevant consideration for prejudice inquiry was that the State's evidence, "while undoubtedly sufficient to convict, was not overwhelming"). Here, the evidence was closely balanced. The physical evidence did not help resolve the identity of the shooter, and so the case presented a choice between believing Cook-Mims and Straight or not. This court has stated that the evidence is closely balanced when judgment rests solely on the credibility of witnesses at trial. *People v. Jackson*, 2012 IL App (1st) 102035, ¶ 17. As discussed above, the credibility of both of the State's witnesses was called into question. Yet, reversal is not warranted here because the record demonstrates that the improper remark did not contribute to defendant's conviction.

¶ 64    We presume that a trial judge knows and follows the law unless the record affirmatively indicates otherwise. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 72. So, we presume that the trial judge

here disregarded the prosecutor's improper remark about the shell casings because it was a fact not in evidence. Indeed, the trial judge appeared aware that it could not treat the prosecutor's remark as evidence. In response to defense counsel's objection during the closing argument, the trial judge stated, "[A]nything that the lawyers say in closing arguments is not to be considered as evidence." The trial court's ultimate ruling confirms that the remark was disregarded. The trial court's comments about the shell casings refer to the issue of whether the gun was fired while it was inside or outside of the car, and not to the trajectory of shell casings. It was a reasonable inference from the evidence that there would not be so many shell casings outside the car if Straight, as the shooter, fired the gun from inside the car. There was also evidence for the trial court to rely on in finding that the location of shell casings outside the car supported the State's theory—Straight testified that defendant hung out of the car for part of the shooting. We must further keep in mind that a significant factor in determining the impact of an improper remark is whether the remark was "brief and isolated in the context of lengthy closing arguments." *People v. Hayes*, 409 Ill. App. 3d 612, 625 (2011). Here, the prosecutor's improper remark was an isolated incident in a lengthy rebuttal that otherwise relied on the evidence and the reasonable inferences from the evidence. There is no basis for reversal.

¶ 65                                    III. CONCLUSION

¶ 66    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 67    Affirmed.